Alright, the next case on the calendar is United States v. Alba We have Mr. Trombley arguing for Mr. Alba Mr. Trombley, you have two minutes for rebuttal and you can begin whenever you're ready. Thank you, Judge Bianco. May it please the court, Peter Trombley for the appellant, Frankie Alba. This appeal presents an opportunity to clarify the law governing sentence reduction motions under the First Step Act. We think it's important to the fair administration of criminal justice to reaffirm a few key principles of reasoned decision making. First, the district court's order must give us confidence the court reasoned through a litigant's arguments. Second, the key conclusions of a district court's order cannot rely on incorrect statements. Third, the presumption that a district court has considered all of the Section 3553A factors is rebutted when the record does not give us confidence a litigant's arguments were fully considered. And if we apply those principles here, Your Honors, the order denying Mr. Alba's motion cannot stand. The order said that Mr. Alba's case was not extraordinary and compelling because obesity was the sole circumstance he relied on. And vaccination made his risk of severe COVID-19 negligible. Both of those premises are wrong. Mr. Alba made arguments based on age and conditions of confinement as well as obesity. And the CDC guidance that the court cited did not suggest in March of 2021 that anyone, let alone someone like Mr. Alba, was at a risk so small as to be disregarded. Mr. Tromberg, let me just say, you can come back to that, but because there are two independent grounds, I want to ask you more, and I know you addressed it in your other points. But the district court, even if there were issues with the risk factors, the district court independently, under the 3553A factors, exercised her discretion to deny the application. So you said your third point was that she failed to consider rehabilitation. But we have said over and over again in numerous cases that a district court, and Halvin was one case, does not have to go through each argument and say, I've considered your rehabilitation. So you're essentially asking us to overrule our prior holdings that a district court does not have to specifically mention that, right? No, Your Honor, I'm not. And I'm glad that you mentioned the Halvin case, because I want to mention a couple factors that this court noted in Halvin that we don't have present here. So in Halvin at 26F4, page 570, the court looked to the extent of the briefing on the updated facts and circumstances before the district court. Here we have the minimum amount of briefing. We have Mr. Alba's motion. And then six days later, the district court denied relief. So this isn't a case where we could feel comfortable that maybe the district court received compelling arguments from the government, and it had those in mind when it denied the motion. Here we don't have the normal type of briefing process. Well, it wasn't normal in the sense that the district judges were receiving hundreds of these motions for compassionate release. And so I think they got pretty good at knowing what was involved and how to decide them efficiently. That's right, Your Honor. There was a large number of these compassionate release motions, but I think that's what makes it really important for this court to lay out the boundaries of what is and isn't enough. And there certainly is no length requirement that we're asking for here. You have to say I've considered rehabilitation. Almost every one of these, just to go back to Judge Chin's point, almost every one of them, one of the things the petition would raise is rehabilitation. This is what I've done since the sentencing. So that would hardly be something unusual that a district court would miss. That was something the district courts were evaluating in every single one of these motions. So you'd say, well, if you don't mention rehabilitation, it's no good. No, no, Your Honor, that's not our argument. And I'd like to get to the second thing that the court looked to in Halvon to feel comfortable that the presumption was appropriate there. And that was the accurate discussion of updated facts and circumstances about the defendant there, the facility at the time of the motion, his medical history, his age and factors involved. Those are all factors that involve circumstances that have changed since the date of the sentencing. And here, this is where we think that the two errors, although they're independent grounds, they come together to give us a picture of what the court's reasoning process was in this case. And I think if we have errors on extraordinary and compelling of the nature that we've identified here, where there is a failure to fully consider arguments, I think that should give this court some doubt about whether the district court fully reasoned through all of these arguments. So, Judge Bianco, to get back to this concern about overruling the court's precedent, we're certainly not asking to do that. If this court wanted to give guidance about a good practice for district courts, I think something you might say is that a best practice would be to look to the rehabilitation evidence that district courts are faced with in these motions because you're right. You're absolutely right that that's something that's going to come up in all of these cases because we're asking. We don't have to do that. The Supreme Court in Concepcion said that, right? They said district courts must, I think that your words must, look at rehabilitation. But they also said they're not required to accept the argument. And they also said on this point that we're discussing, the first FDAC, nor does the first FDAC require district court to make a point-by-point rebuttal of the parties' arguments. So, I don't think we have to suggest anything in the Supreme Court. Isn't that exactly what we're talking about? That's right, Your Honor. And we think Concepcion helps underscore why we're correct in this case. Mr. Alba made an argument based on a permissible factor looking to his rehabilitation, something that is always going to be appropriate and important to consider when we're talking about whether the original sentence should be justified. In this case, whether it needs to be any shorter. And we think, in this case, Mr. Alba pointed to rehabilitation arguments on page A67 about what he had done since his sentencing. And I think he had done all that he could. He had held high-trust positions in his facility. He had maintained a clean disciplinary record. And there was no response on that point from the district court. And I appreciate the point, Judge Bianco, that we're not trying to impose any sort of incantation requirement. This Court's consistently rejected that. But what we are saying is that this Court should require a reasoned decision-making process that gives us confidence that when the district court exercised its broad discretion to decide whether to reduce the sentence or not, the reason that this Court would defer to that discretion is because we're fully confident that all the arguments have been considered and all the right steps have been taken. And I don't think that this record gives us that confidence because of the failures on Extraordinary and Compelling. Now, I see that my time is running short. I do. Counsel, let me ask you a question before you make your final point, which is your client's been released to home confinement now, right? That's correct, Your Honor. First question, is part of this appeal then moot to the extent he was requesting release to home confinement? And secondly, generally, how should we take that into account in considering the merits here? Right, Your Honor. The appeal is not moot at A69, A70. His prayer for relief makes requests in the alternative. But in part is my question. So he no longer needs a release to home confinement, but what he could seek and was seeking and is still seeking is a reduction to time served, and that's still open and available. Now, to how this affects maybe the way that Your Honors might think about this appeal, it is true that he's no longer facing the present ongoing risk of being confined in a place like Lewisburg Prison Camp, that he has increased vulnerability because of his individual factors, but he's now saying that he was still saying that my sentence is too harsh because of the present things I'm facing. He's still saying now that his sentence was too harsh and doesn't need to continue because of circumstances that he's experienced during the pandemic and courts have recognized. The other issue on mootness, I think, is the government, the Bureau of Prisons can revoke that. The government's position is that it's in their discretion, and I don't know what the standard would be, but they could put him back in jail under the current sentence, right? That's right, Your Honor, and I think our reply brief, page 12 in footnote 6, we know that that's possible. You said you want to make one other final point, so if you want to do that, I would. Your Honor, I'd just like to say that the errors in the district court's order remain relevant today, even though some circumstances have changed. For Mr. Alba to make an argument based on a combined set of factors about his updated facts and circumstances, about his experience during the pandemic and the risks that he faced and the harshness of the term incarceration he had, we would hope that this court would clear away the errors that led it to narrow and then not take seriously some of the arguments that we believe the motion put before it. So we think it's important for the court to vacate this decision at remand, and I look forward to returning it on rebuttal. All right. Thank you, Mr. Trombley. We'll now hear from Mr. Capozzi. Good morning. May it please the court. I am Timothy Capozzi, and I represent the government in this case, and I represented the government below. The district court acted within its broad discretion when it denied the defendant's request for compassionate release. The defendant, who is currently on home confinement, is a repeat offender who was arrested with a loaded gun in a secret compartment while attempting to traffic massive quantities of heroin and cocaine. After serving about 40 percent of his below-guideline sentence, he filed the motion at issue in this appeal. The record amply supports that in denying the motion on two independent grounds, the district court understood the law and appropriately applied that law. First, the court found that the defendant had failed to meet his burden of demonstrating an extraordinary and compelling reason for his release. Second, the court found that the Section 3553A factors weighed against granting the defendant's motion. Was it an error for the court to refer to obesity as the sole circumstance meriting release? Your Honor, it was not clearly erroneous for the district court to do that. In this case, the district court appropriately, and Your Honor, referred to the volume of petitions or motions of this nature that were presented to the district court. Here, the district court focused on the principal factor that the defendant focused on in his motion. The defendant filed a 26-page motion, and the sole health condition that he specifically referred to was his obesity over and over again. I count at least seven times, with the potential exception of passing references to arthritis-type symptoms that do not appear to be issues that are currently pushed by him as things that should have been focused on. He focused on his obesity, his 30.7 BMI, and the district court, in denying the motion, appropriately then responded in kind by focusing on the principal factor that he had focused on. Your Honor, the district court was clearly aware, and it's apparent from the written order that the defendant was incarcerated at USP Lewisburg, was clearly aware that he was a 48-year-old inmate, and then cut to the chase and said, you are citing your obesity, and obesity in light of your vaccination, and after consideration of all the, you know, I'm paraphrasing obviously at this point, but you've simply failed to establish and satisfy your burden of establishing extraordinary and compelling reasons justifying a sentence reduction. As Your Honors already noted, even if there were some concern about the use of that word sole, Your Honors could have ample basis to affirm on the basis of the 3553A factor analysis, and not even address the finding on extraordinary and compelling reasons. And there would be, again, ample basis, and certainly no justification in the record to find a clearly erroneous assessment of those 3553A factors. The district court, who had presided over this case from its initial charging, considered the circumstances of the offense, considered the history and characteristics of this defendant, noted explicitly in the written order that the issues of deterrence and punishment continued in the context of this motion to be important factors. As most of the compassion release orders do when the movement does argue rehabilitation, which as I noted in almost every case, they do generally mention, at least reference the fact that they've considered it. Should we have some concern that's not in here? Your Honor, it is certainly common that decisions on compassion release will give some reference to the rehabilitation, but there is certainly no basis to rebut the presumption that the district court considered all of the arguments that were put forth in front of it. And the defendant now really is asking for a rule that rehabilitation needs to be addressed in every order, and that would be contrary to the precedent and simply unnecessary. Now, would it be a good practice? Perhaps. But there shouldn't be a rule that requires the district courts to recount every argument made by a defendant and write them out in their written opinion. Can you address Judge Meary's question to Mr. Trombley about mootness? What's the government's position? Does the government believe there's a mootness issue or not? Your Honor, we're not seeking a pursuing mootness as a basis for not affirming at this time. We concede that the defendant is still serving his sentence, and therefore, theoretically, if this were returned to the district court, the district court could reduce the sentence. So that he wasn't on home confinement, right? So that he was not on home confinement at all, right? Correct. And also, am I correct, it's the government's position? I know there's a regulation being published that BOP has the authority under some unknown discretionary standard to just say you're coming back. That's consistent with my understanding and that we defer to the BOP on that determination. Your Honor is more familiar with that regulation than I am. I'm not that familiar with it. Even then, you're still more familiar with it, I think, than I am. But correct, there is still a sentence that is being served. We believe that the district court could, obviously, if the BOP further incarcerated him, then there would be, you know, everything that that would entail. Obviously, if it were returned at this time, it would seem that on the merits, it would be potentially hard to understand how it would succeed since the thrust of the motion was based on the obesity in the context of being an incarcerated individual. If the court has no further questions, I will rest on our submission. I don't think there are any other questions. Thank you. Thank you. Mr. Tromble, you have two minutes. Thank you, Your Honor. I'd like to make three points. The first is what I heard from counsel for the government, that Mr. Alba's principal argument was obesity. And I think if you look to the government's brief at pages five to seven, you'll see a number of bullet points recapping what Mr. Alba's arguments are. And you'll see there that you'll find age and conditions of confinement right alongside obesity. Now, the government's next response to that is that the district court did say... Do you think the district court ignored age and the conditions of confinement just because she didn't specifically mention them in the decision? She does mention those as descriptive facts, but they're not treated as combined factors that would contribute to a claim of extraordinary and compelling circumstances. And I think there are a number of orders in this circuit. We look to cases like Rodriguez and Canones, which you cite in our opening brief, where those factors are all treated in combination. So it certainly wasn't the case that age and conditions of confinement were frivolous arguments that shouldn't have been thought of. And I'll look to the district court's language. The district court said that Mr. Alba only pointed to obesity. And it's not a correct statement to say that he was only pointing to obesity. Now, I'd like to just emphasize that this might seem like there are only a few words that we're arguing about here, but it really is the core of the district court's reasoning that were challenging when the district court said that the sole circumstance that Mr. Alba relied on was obesity and that his risk was negligible. Those were the key bases for the conclusion at issue here. And if those don't give us confidence that the district court considered all the arguments and came to a reasonable conclusion based on CDC guidance that we believe doesn't support a negligible finding, then I think that undermines confidence in the entire order. And that takes me to my second point, that we're not asking for a rule here about specifically mentioning rehabilitation in every point I know. I mentioned this in my call with you, Judge Bianco. But what we are asking for is orders that if they don't mention factors, they need to give us confidence that a litigant has had a full and fair hearing. And we don't think that Mr. Alba got that on this motion. My final point is that the government made a comment about maybe the thrust of the motion being gone or dissipated because of the change in circumstances. And I would say to your honors that in our open brief on page 17, we looked at cases like United States v. Filbert and United States v. Rodriguez. Reports have recognized that a much harsher term of incarceration has been imposed as a result of the pandemic. And we would ask for an opportunity for Mr. Alba, who has arguments available to him, based on the harsh term of incarceration he's experienced and based on his rehabilitation, to have an opportunity to get the fair shot that we don't think that he received in March of 2021. Thank you, your honors. Thank you, Mr. Trombley. Thank you both. And we will reserve the decision. I want to thank Latham and Watkins for taking this case pro bono. They did an excellent job both in the papers and today. Thank you, your honors. All right. Have a good day. Next, the last case being argued today is Valdez v. Brooks et al. We have Mr. Kaufman by way of Zoom. Mr. Kaufman, are you able to hear me okay? Yes, absolutely, your honor. All right. Great. So you have ten minutes and you can begin whenever you're ready. May it please the court. We believe the court has erred by weighing or determining credibility, always against Mr. Valdez and not for the defendant. Further, the lower court has selected only certain conclusions or inferences from the facts among the competing conclusions or inferences. Again, however, only those conclusions or inferences that favored the defendant. At the summary judgment stage, the lower court should be weighing the evidence in the light most favorable to the unmoving party. There is not one instance in the entire written opinion where the court has favored testimony or evidence that supports the plaintiff's version of what occurred. In fact, in multiple hypotheticals, the lower court points out that even the plaintiff's expert gave this unfavorable opinion. However, in each of those instances, those hypotheticals ignore the plaintiff's version of what happened or assign an astounding level of believability. Let me ask you, Mr. Kaufman, because I think causation is, there are issues about whether or not the standard of care was breached or not. But on the issue of causation, the district court concluded on each of these, even construing the testimony most favorably to you and your client, and drawing all inferences in your favor, that a jury could not rationally find causation here. And I want you to explain, for example, the lack of communication with Dr. Brendel, your own expert said that it's unknowable whether there would have been a different outcome if they had consulted. So how would you plan to establish causation when your own expert describes that as unknowable? Well, in that scenario, he was saying that it was not within 100% certainty. Now, that's not the test. The test is the reasonable degree of medical certainty, and that degree is more probable than not. I know, but he didn't say that either, right? He didn't say that. He didn't say within a reasonable degree of medical certainty or even more probable than not. If he had consulted Dr. Brendel, this would have been avoided for these reasons. Then we'd be in a different category. Why don't you tell me, what information did Dr. Brendel have? If he had reached out to Dr. Brendel, that would have alerted to him to some bigger, imminent threat of harm than he was aware of from his own observations during that day. Well, first off, Dr. Brendel was only one of the claims we were making. There were multiple claims. But as far as Dr. Brendel, in this case, the defendant had agreed not to talk to the treating physician at all. And I had discussed this with their expert and our expert if this was something that they would ever do in this situation. And the answer was no. Of course they talked to him. I understand that. But if Dr. Brendel, I don't know if he was deposed, but if he was deposed and he said, well, if he had called me, I would have told him I had spoke to him earlier that day, and he was saying a lot of things about harming himself imminently, and I would have told those things to Dr. Brooks. Then you might have a different situation. Your expert might have looked at it differently. Juries could look at that differently. But I don't think we have any type of – I don't know, was Dr. Brendel deposed on that, what he would have said if he was a consultant? No, he wasn't deposed on that. The issue we had was that's not the only issue involved in this case, Your Honor. There was the issue of that member. Before we move on this issue, didn't your expert say yes when asked if it was speculating to suggest that it would have mattered if Dr. Brooks and Dr. Brendel had talked? Yes, of course. Why doesn't that knock out the causation completely if your expert admits that it's speculation? Well, all cases involve speculation. In this scenario, he doesn't know what would have said or not said. The fact was he didn't even try. He didn't follow a duty. There was no follow-up, which is required. In this situation, we had – our client was saying, listen, I'm going to kill myself. I have all these problems. I'm closing my practice down. I'm giving medication out because I'm planning my death, and this is an emergency situation. Now, in an emergency situation, he can actually avoid complete discussions. Now, we don't know what the doctor might have said or not said at that point based on the information we had because we couldn't do it. All information is speculative in that case, but as far as that goes, that was only one of the small issues involved with the causation. We had a ridiculous amount of evidence showing that he was absolutely suicidal. He was closing his practice down. He was actually avoiding everybody. He was calling the doctor multiple times. Defendant has an independent duty to develop a follow-up plan, which he didn't do, and that was clear. Their expert said he had a duty to do it, and our expert said that. There's always going to be parts of a case that aren't as great as you want them to be. But in this case, it has to be the light most favorable. The judge in this case completely didn't pay attention to anything that her husband, Mr. Valdez, testified to. He said he spoke to the doctor. What safety plan did your expert testify to that could have avoided this tragedy? What did your expert say? What was the safety plan your expert said would have avoided this tragedy? It's a required follow-up done by all New York physicians in this case where suicide is involved, and never did it. Just arbitrarily chose not to do it. What do you mean? Explain that to me. He's not a psychiatrist. He's a- Explain that. What did you say? He should have had a follow-up. There's a required follow-up plan when somebody comes in for a suicide that you have to do. He never did that. And your expert said if he had done that, this would have been avoided? Did your expert say if he had done that? Yes, there's a possibility that would have happened. Remember, it only has to be a reasonable. It doesn't have to be 100%. There's a difference between a possibility and a likelihood. As I understand it, your expert said it was not necessarily a deviation for Dr. Brooks not to have a follow-up plan. Is that a sufficient basis for a jury to find that there was a deviation from the standard of care? When we depose their expert and our expert, there's always going to be an issue where they go, oh, here's a gotcha moment or here's not a gotcha moment. What I'm suggesting in this case is there was a ridiculous amount of evidence completely not paid attention to. I don't know what that means, a ridiculous amount of evidence. We keep asking you about specific testimony by your expert, including testimony that it was not necessarily a deviation for Dr. Brooks not to have a follow-up plan. And your response to that is what? The issue in that question, when the question was asked, it was about – it dealt with why you have to do a follow-up. You have to do this when it's a significant issue, when they believe suicide is definitely on the table. In this case, it was. We put that evidence forward. Now, what the judge said in this case was the plaintiff offers no evidence that this termination was not made in good faith. And we did have things forward. We had discussions with Mr. Valdez and the doctor that weren't even included in his order. I don't know if you're followed up. I'm sorry. No, you have two minutes left. You can add anything else you want to add. I'll do what I can. One of the big things is they disregarded conflicting testimony from Mr. Valdez and the defendant as it relates to certain admissions made on the phone call that occurred after the suicide. And our brief, this is under Section Mark, weighing credibility of witnesses. The second is the lower court unfairly characterized the phrase unknowingly, so as to be mutually exclusive from the phrase within reasonable degree of medical certainty. This is under the section of our brief that speaks to reasonable inferences. It is unrefuted that any doctor licensed to practice medicine in New York is required to document suicide IDH. In addition, for treating physicians, such as the defendant in this case, to develop a follow-up plan. For a treating physician, the follow-up plan is really the tool most likely to prevent a suicide if a suicide can be prevented at all. At the time of their last meeting between the deceased and the defendant, the defendant was aware that the deceased was actively treating for mental depression and suicidal thoughts by another doctor. The defendant was made aware of their relationship at the beginning of the treatment with the deceased. This didn't happen in one meeting. He knew this over multiple treatments, that there was another doctor consulting, and he was just providing the medication. So the person who had the expert test meet could have been a better one to go to. And most doctors, and in fact their own experts, said they would have consulted. And I said, have you ever been in a situation where you haven't consulted? And he had handled thousands of cases. He said, no, I've never had one where I didn't consult with a treating physician. Now, this was a decision that Dr. Brooks intentionally made. Now, there were a lot of issues involved. We're not weighing our decision based on solely him not doing this or solely not doing that. But there was a lot of evidence out there that could have showed causation that we had out there. And that's really for a jury to decide, not just to pick one issue and go, okay, we're going to go with this one. Our expert gave the opinion that a follow-up plan would not be necessary if it was a fair determination that there was no imminent threat. We showed that there was imminent threat. He closed his practice down. He canceled all his appointments. He constantly tried to contact the doctors. This is an emergency. I want to kill myself. Now, if that's not imminent harm, that's for a jury to decide, not for the judge to decide. All right, thank you, Mr. Kaufman. We'll now hear from Ms. DeCrow-Goldberg. Good morning, Your Honors. May it please the Court. I'm Barbara DeCrow-Goldberg. I represent Dr. Brooks and his practice, New York Ketamine Infusions. I want to go back to another point that the district court made, because I think there are actually two bases upon which this court can affirm the determination of the district court. The only evidence in the record is that Dr. Brooks, during the examination on January 30th, 2017, conducted a careful examination. In fact, the plaintiff's expert, Dr. Reitman, conceded that based on his testimony, which he described what he did in detail, he asked the decedent questions, he looked at him, he assessed his mannerisms. Based on that testimony, plaintiff's expert conceded that Dr. Brooks conducted a careful examination. And in our brief, we have cited a number of cases that say that liability will not attach for failure to prevent suicide if doctor exercises his professional judgment after a careful examination. And that's what we have here. And I think it's erroneous for the plaintiff to state that Dr. Clota, the decedent, was quote-unquote closing down his practice. The evidence is that he said he wrote a few transfer notes, he wrote a few prescriptions. There's no testimony about him quote-unquote closing down his practice. He'd been trying to- Is there evidence as to whether Dr. Brooks knew about the transfer notes? He told Dr. Brooks that he had been writing transfer notes and prescriptions. But the important point is that by the end of the session, the infusion itself took about an hour, and then Dr. Brooks continued speaking to the decedent after the infusion, and based on everything that the decedent said, based on what he observed, based on what he knew, Dr. Brooks concluded that the suicidal ideation had abated. Well, what did Dr. Brooks say about the fact that he was telling him not to contact his psychiatrist? That's a pretty, I think, I don't know. Isn't that an unusual thing to tell one doctor, I don't want you talking to my other doctor, especially in this context where you have suicidal ideations? I think that the way the district court described that was that it was somewhere less than typical, but somewhere more than unheard of.  Well, is there enough then for a jury to conclude that it was a deviation? Your Honor, I don't think that there is enough here for a jury to conclude that there is a deviation, because even the plaintiff's expert said that he had had patients who were suicidal, and then over the course of a day, over the course of observing the patient, the suicidal ideation had abated. And he was asked a number of questions at his deposition as to whether, I think one of the expressions was, can the patient step back from the abyss on his own? And he said yes, and he said that suicidal... But in that type of situation, wouldn't it be important to speak to the other doctor? If you have a patient who is at that level of planning, where I have suicidal ideations, and they ask, do you have a plan, yes, I transferred some of my patients, whatever he said to that. He didn't say that in general. He said that as part of, I think, a response to, do you have a plan to show yourself. He didn't. He told Dr. Brooks that he didn't have a plan. He told Dr. Brooks that he didn't have any weapons. And I think it's important to note... Transferring the patients is what I'm saying, was not some general talk about his practice on transferring patients. It was in the context of... He said he had written a few transfer notes and a few prescriptions, but importantly, he told Dr. Brooks... In that situation, you're a doctor, you're hearing that, and you know he's under the care of a psychiatrist, right? And he's telling you, don't speak to my psychiatrist. Isn't that a real red flag? Your Honor, I think the answer to that is that there is an exception under HIPAA, under the Health Insurance Portability and Accountability Act, that a physician can breach a patient's confidentiality only when it's, quote-unquote, necessary to prevent or lessen a serious and imminent threat to the health or safety of a person. And as the district court found, that applies only when the doctor makes a good faith determination that such a necessity exists. And the HIPAA regulations specifically defer to the professional judgment of a health care professional in making the determination of whether a patient... You're not suggesting that Dr. Brooks had called Dr. Brindel in this situation that would have been a HIPAA violation. Are you suggesting that? I am suggesting that, Your Honor, that the patient had instructed him not to contact Dr. Brindel. He determined that the patient was not at an imminent risk of self-harm. Therefore, the exception under HIPAA that would have allowed him to contact Dr. Brindel did not apply. And also, I think it would have jeopardized the therapeutic relationship with Dr. Brooks if Dr. Brooks had violated the patient's express instruction not to contact Dr. Brindel. But you also questioned the patient about why he was making that request. That would be another way of handling that. If you're concerned you have a HIPAA violation, you could ask the patient, well, I want to get as much information as possible. You're clearly suffering here. I think we can help you more if I speak to your doctor. You wouldn't just leave that alone, right? You would follow up on that, wouldn't you? I think that if the patient said, no, I don't want you to contact my doctor, and he concluded that the patient was no longer suicidal, and in fact the patient had told him that the suicidal ideations had started abating the previous day before he came to Dr. Brooks, under those circumstances, I don't think that the physician in the position of Dr. Brooks is obliged to contact the psychiatrist. And again, that brings us to the entire question of proximate causation. As the court pointed out during Mr. Kaufman's argument, Dr. Reitman specifically conceded that it was unknowable whether contacting Dr. Brindel would have prevented the suicide, and his testimony was otherwise very speculative and conclusive. For instance, he testified that the communication could possibly have led to some kind of discussion or intervention that could have possibly prevented the occurrence. This is at pages 578 through 580 of the record. That does not reflect a reasonable degree of medical certainty. Basically, he's speculating. Dr. Reitman, the plaintiff's expert, never said concretely what would have happened if Dr. Brooks had contacted Dr. Brindel. He said that it's unknowable. And as for the safety plan of action that Mr. Kaufman referred to, Dr. Reitman specifically conceded that where no suicidal ideation persisted, an action plan would have been unnecessary. That's at pages 604 to 605 of the record. And he also conceded that at the time of the presentation to Dr. Brooks on January 30th, the patient was not at an imminent risk of harm to himself, and that's at page 584. And I think that it's very clear from the record that suicidal ideation can come on, it can pass. As I mentioned, even Dr. Reitman conceded that he'd had patients who stepped back from the abyss and their suicidal ideation had passed. And there's just no evidence that at the time he left Dr. Brooks' office on January 30th, that the patient was suicidal or that he was at an imminent risk of harming himself. And I think it's important to point out that even over the course of the next two days, going into the evening of February 1st, before he committed suicide on February 2nd, he was in daily contact with the plaintiff, his husband. They spoke on the telephone. They texted several times a day. The plaintiff didn't notice anything amiss in their conversations. All he could say was that at the time of the final conversation, he sounded a little flat and he sounded a little sleepy. There was nothing to indicate to the plaintiff that he was planning anything like this or that anything was wrong. And it came as a complete shock to everyone, Dr. Brendel included, Dr. Brooks, and, of course, the plaintiff. And I say I have about 20 seconds left. If the Court has no further questions, I will rest on the arguments in the brief. I don't think there are any other questions. Thank you. Thank you, both of you, and we'll reserve the decision. Have a good day. Thank you. The last case, as I noted, is on submission, Stegeman v. Price. That completes the business of the Court. We thank Ms. Spear, our deputy today. I would ask that she adjourn the Court. The Court stands adjourned.